UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| *ex rel.* GREGORY HANDLOSER § | |
| § | |
| v. § | CIVIL NO. 4:20-CV-275-SDJ |
| § | |
| INFOSYS LIMITED § | |

**MEMORANDUM OPINION AND ORDER**

Relator Gregory Handloser alleges that Defendant Infosys Limited violated the False Claims Act ("FCA") in two ways. First, Infosys decreased its federal-tax obligation by unlawfully underpaying H-1B visa workers. Second, Infosys decreased its obligation to pay H-1B visa-application fees by fraudulently acquiring cheaper L-1 visas for H-1B employees. Handloser's allegations fail to state a claim because Infosys was not obligated under the FCA to pay higher payroll taxes for wages it never paid or to pay application fees for applications it never filed. For these reasons, Infosys's Motion to Dismiss Amended Qui Tam Complaint, (Dkt. #42), is granted.

**I. BACKGROUND**

Handloser worked for Defendant Infosys as a sales manager from August 2004 until his termination in December 2012. (Dkt. #33 ¶¶ 4, 31). Infosys is a multinational corporation, based in India, that provides information technology and consulting services to customers located worldwide, including in the United States. (Dkt. #33 ¶ 5). Infosys has twenty-five U.S. offices, employing about 31,000 domestic workers. (Dkt. #33 ¶ 10). Most of these workers are visa holders. (Dkt. #33 ¶ 10).

1

Infosys requires two types of visas to meet its domestic-staffing needs: H-1B visas and L-1 visas. (Dkt. #33 ¶ 15). H-1B visas are for "specialty occupations" that require certain technical expertise and educational credentials.[1] The United States issues no more than 65,000 new H-1B visas each year.[2] 8 U.S.C. § 1184(g)(1)(A)(vii). Because demand for H-1B visas far exceeds supply, applicants compete "through a highly competitive lottery system for these visas." (Dkt. #33 ¶ 20). Indeed, once the filing period begins each year in early April, the 65,000 cap "is generally met within the first five business days (or very shortly thereafter)." (Dkt. #33 ¶ 20). Although each applicant must pay a fee when submitting a visa application, that fee is refunded for applicants not selected in the lottery. (Dkt. #33 ¶ 22).

In addition to the application fee, H-1B visa applicants must submit a Labor Condition Application ("LCA"), attesting to how many specialty occupations exist and certifying that the employer will pay the visa holder a certain wage while employed. (Dkt. #33 ¶ 18). This wage must be the greater of the wage paid by the employer to "all other individuals with similar experience and qualifications for the specific employment in question," 20 C.F.R. § 655.731(a)(1), or the "prevailing wage," *id.* § 655.731(a)(2). The Department of Labor (the "Department") provides guidance on prevailing wages "based on the 'nature of the job offer, the area of intended

---

[1] *See* 8 U.S.C. § 1184(i)(1)(A)–(B) (defining specialty occupation as "an occupation that requires—(A) theoretical and practical application of a body of highly specialized knowledge, and (B) attainment of a bachelor's or higher degree in the specific specialty (or its equivalent) as a minimum for entry into the occupation in the United States").

[2] An additional 20,000 visas may be issued each year for individuals with graduate degrees from American universities. 8 U.S.C. § 1184(g)(5)(c). Other narrow statutory exceptions also apply, *e.g.*, *id.* § 1184(g)(B)(ii)(I–II), but none of them are relevant here.

2

employment, and job[] duties for workers that are similarly employed.'" (Dkt. #33 ¶ 44). In fact, the Department lays out "four wage levels for each occupation code's prevailing wage: Level I, Level II, Level III, and Level IV":

> Level I is an entry level wage rate "for beginning level employees who have only a basic understanding of the occupation." Level II is a qualified wage rate for "employees who have attained, either through education or experience, a good understanding of the occupation." Whereas Level III (experienced) and Level IV (fully competent) wage levels are reserved for senior employees with "sound understanding of the occupation" or "advanced skills and diversified knowledge," respectively.

(Dkt. #33 ¶¶ 44–45) (internal citations omitted).

L-1 visas, by contrast, require no attestation on minimum wages and are available for only a much narrower scope of individuals: management-level employees and subject-matter experts. 8 C.F.R.§ 214.2(l)(1)(ii)(B). Because of the narrower scope, the United States has not capped the number of L-1 visas. Nor do L-1 visas require an LCA. And according to Handloser, Infosys's application fee for an L-1 visa was $1,000 less than the application fee for an H-1B visa until March 31, 2020. (Dkt. #33 ¶ 26).

In applying for its H-1B and L-1 visas, Infosys allegedly engaged in two types of fraud. *First*, Infosys fraudulently underpays its H-1B visa workers by about 30–40 percent. (Dkt. #33 ¶¶ 32, 43). Infosys underpays its visa workers by "misrepresenting on LCAs and visa petitions the experience of the employees for whom it seeks a visa[.]" (Dkt. #33 ¶ 46). This misrepresentation then allows Infosys to "select a lower prevailing wage rate on the LCA and visa petition than appropriate (*e.g.*, Level I or Level II vs. a Level III or Level IV)." (Dkt. #33 ¶ 46).

In support, Handloser points to general visa-application data for Infosys and to alleged underpayment he witnessed when working there. The visa-application data show that over sixty percent of Infosys's LCAs from 2014 to 2018 were for lower-skill workers that were paid "the Level I or Level II prevailing wage rate." (Dkt. #33 ¶ 47). In Handloser's opinion, these classifications must be false because "Infosys typically sends its most talented employees from India to the U.S. for work (individuals who should rightfully be paid at Level III or Level IV prevailing wage rates)." (Dkt. #33 ¶ 47). Yet Handloser provides nothing to support this conclusion. He also notes that Infosys "pays its H-1B visa workers significantly less than its industry competitors," (Dkt. #33 ¶ 48), suggesting that these wages must therefore be fraudulent.

The practices Handloser witnessed firsthand relate to discrepancies between internal project-staffing documents and the as-filed LCAs for those projects. According to Handloser, Infosys staffed projects based on the number of employees listed in a signed Master Service Agreement ("MSA"). (Dkt. #33 ¶ 30). But that number often deviated significantly from the number of positions Infosys attested to in LCAs it submitted for those projects. *See, e.g.*, (Dkt. #33 ¶¶ 49–53). Along with those deviations, Handloser notes several discrepancies between employee wages or levels for positions attested to in LCAs and the wages or employee levels that were needed for certain projects according to the MSAs. (Dkt. #33 ¶¶ 49–53).

Most of the examples Handloser details are from projects he managed between 2009 and 2012. But one example concerns a 2016 project with Harley Davidson and

4

one specific employee—Rohit Singhal. (Dkt. #33 ¶ 52). Handloser claims that Singhal's job duties and experience were those of a Level III or IV employee. (Dkt. #33 ¶ 52). But Singhal's LCA shows that he was hired as a Level I employee. (Dkt. #33 ¶ 52). From this example and a few other scattered examples he witnessed while at Infosys, Handloser asks the Court to infer that "Infosys fails to pay a *significant number* of its H-1B visa workers the proper wage rate," depriving "the U.S. government of significant tax revenue." (Dkt. #33 ¶ 54) (emphasis added).

*Second*, Handloser points to Infosys's "fraudulent acquisition of L-1 visas in lieu of more expensive H-1B visas." (Dkt. #33 ¶ 32). In essence, he claims that Infosys "falsifies individuals' job titles and work responsibilities on their L-1 visa applications" to improperly secure L-1 visas for them. (Dkt. #33 ¶ 55). In support, Handloser points out that Infosys was "one of the top three filers and recipients of L-1 visas" from 2016 to 2019, (Dkt. #33 ¶ 56), suggesting that fraud can be inferred from the volume of visa applications Infosys filed. Handloser also supplies one example from 2012 of an employee performing H-1B duties who obtained an L-1 visa. (Dkt. #33 ¶ 58). Outside of this example, he provides no further support for this claim. Still, Handloser suggests that the Court can infer from this discrete example that this practice was widespread. And because L-1 visa applications cost Infosys $1,000 less than H-1B visa applications, Infosys deprived "the government of revenue it would otherwise collect." (Dkt. #33 ¶ 59).

Handloser sued Infosys in April 2020. In the original complaint, Handloser asserted only the first legal theory described above: the fraudulent underpayment of

5

H-1B visa employees. (Dkt. #1 ¶¶ 64–68). But after the Government declined to intervene and the case was unsealed, Handloser filed his First Amended Complaint ("FAC"), alleging for the first time that Infosys had also deprived the Government of visa-application fees.

Since that filing, Infosys moved to dismiss the FAC for failure to state a claim. (Dkt. #42). Infosys also filed four supplemental notices, containing rulings from other federal courts that evaluated similar claims to those Handloser asserts here. (Dkt. #64, #66, #68, #70). Handloser responded to each of those filings, with the exception of Infosys's most recent notice. (Dkt. #65, #67, #69). The motion is fully briefed and ripe for resolution.

## II. LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (citation modified).

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not. *Id.* Courts accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). To determine whether the plaintiff has pleaded enough to "nudge[] [its] claims . . . across the line from conceivable to plausible," a court draws on its own common sense and judicial experience. *Iqbal*, 556 U.S. at 679–80 (quoting *Twombly*, 550 U.S. at 570). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

In conducting this review, the Court's inquiry is limited to "(1) the facts set forth in the [amended] complaint, (2) documents attached to the [amended] complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).[3]

### III. DISCUSSION

Handloser alleges two reverse-false-claims violations against Infosys under the FCA. First, he contends that Infosys falsified wage information in LCAs for H-1B visas and wrongfully decreased its obligation to pay the federal government payroll

---

[3] The Court recognizes that claims asserted under the FCA—an antifraud statute—must "comply with Rule 9(b)'s heightened pleading standard." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 371 (5th Cir. 2017). But because the Court finds that Handloser fails to plausibly state a claim under Rule 12(b)(6), the Court need not reach whether Handloser's claims comply with Rule 9(b).

7

taxes by fraudulently and unlawfully underpaying H-1B visa employees. (Dkt. #33 at 33). Second, Handloser asserts that Infosys "systemically avoided and/or decreased its obligation to pay H-1B visa application[] fees by fraudulently applying for cheaper L-1 visas for work [Infosys] knew required an H-1B visa[.]" (Dkt. #33 at 33–34). The Court takes each in turn.

## A. Pleading Requirements for a Reverse False Claim

The FCA "imposes significant penalties on those who defraud the Government." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 180, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016). However, the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." 579 U.S. at 194 (citation modified). It authorizes two types of claims. Traditional or affirmative false claims arise from an "improper payment by the government to the defendant." *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004). Reverse false claims, by contrast, impose liability on "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." *Id*. at 652–53 (5th Cir. 2004) (quoting 31 U.S.C. § 3729(a)(7)). "In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated." *Id*. at 653. Only reverse false claims are at issue here.

Liability under the reverse-false-claims provision arises when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). In other words, a reverse-FCA claim may be asserted when a person "knowingly and improperly avoids an obligation to pay the United States." *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1034 (5th Cir. 2016). Although courts were once split on what constituted an "obligation," Congress resolved that split[4] with an amendment to the FCA in 2009.[5] In the amendment, Congress defined "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" 31 U.S.C. § 3729(b)(3).

**B. Handloser's Alleged Underpayment of Taxes**

Handloser's claim that Infosys fraudulently decreased its tax burden by underpaying H-1B employees fails to plausibly allege an FCA violation because Infosys had no "obligation" to pay taxes on wages that it never paid.

The Fifth Circuit has not yet opined directly on Handloser's reverse-false-claims theories. Still, it has issued several helpful FCA-related rulings. *Simoneaux* is

---

[4] *See, e.g.*, *Simoneaux*, 843 F.3d at 1037 & nn.7–9.

[5] Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(a)(2), 123 Stat. 1617, 1622–23 (2009).

9

particularly instructive, which held that "unassessed regulatory penalties are not obligations under the FCA." 843 F.3d at 1039; *see also Bain*, 386 F.3d at 657 ("[T]he reverse false claims act does *not* extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed."). The D.C. Circuit has reached the same conclusion, holding that "contingent exposure to penalties which may or may not ultimately materialize does not qualify as an 'obligation' under the [FCA]." *United States ex rel. Schneider v. JPMorgan Chase Bank*, 878 F.3d 309, 315 (D.C. Cir. 2017) (citation omitted). The *Simoneaux* court also clarified that an obligation under the FCA requires an established duty "to pay or transmit money or property *to the Government*." *Simoneaux*, 843 F.3d at 1039 (quoting 31 U.S.C. § 3729(a)(1)(G)) (emphasis added). Against this backdrop, the Court analyzes Infosys's purported "obligations."

According to Handloser, Infosys had an obligation under 20 C.F.R. § 655.731(a) to pay certain wages to its H-1B visa employees. (Dkt. #49 at 27). By paying a wage 30–40 percent lower than required, Handloser maintains that Infosys decreased its "obligation to pay the government associated taxes based on a percentage of those required wage levels" under 26 U.S.C. § 3111(a). (Dkt. #49 at 27).

Handloser misinterprets which obligations are relevant under the FCA. Infosys's obligation to pay certain wages to its H-1B employees is not a duty to pay money "to the Government." Rather, it's a duty to pay money to its H-1B employees and therefore is not an "obligation" under the FCA. While future regulatory penalties

10

could be assessed for Infosys's failure to pay certain wages, "unassessed regulatory penalties are not obligations under the FCA." *Simoneaux*, 843 F.3d at 1039.

To be sure, Infosys has a duty to pay money to the Government under 26 U.S.C. § 3111(a), which requires "every employer" to pay "an excise tax" of "6.2 percent of the wages . . . paid by the employer." But Handloser does not suggest that Infosys failed to pay taxes for the salaries it paid to H-1B employees. Quite the opposite: "Infosys did not make any false 'statement' or 'record' under the Tax Code, or otherwise violate the Tax Code." (Dkt. #49 at 19). By Handloser's own admission, Infosys met its tax obligation for the wages it paid. Any duty Infosys had to pay additional taxes for wages it *should have* paid is a "contingent" obligation—not an "established" obligation as required by the FCA. *Simoneaux*, 843 F.3d at 1039. For this reason, Handloser's first theory fails to plausibly allege a reverse false claim under the FCA.

Every other federal court to rule on this specific tax-reduction-through-visa-wage-underpayment claim under the FCA has concluded the same. *E.g.*, *United States ex rel. Billington v. HCL Techs. Ltd.*, 126 F.4th 799, 804, 806 (2d Cir. 2025) (holding that the defendant had no obligation to pay taxes for wages "it *should have* paid, but did not pay"); *United States ex rel. Palmer v. Tata Consultancy Servs.*, Civil Action No. 4:17-CV-72, 2025 WL 1445864, at *12 (E.D. Tex. May 20, 2025) (same); *United States ex rel. Kini v. Tata Consultancy Servs.*, No. 17-CV-2526, 2024 WL 474260, at *5 (D.D.C. Feb. 7, 2024) (holding that "Defendant did not have an 'obligation' under the FCA to pay its employees higher wages").

11

Handloser relies on *United States v. Pemco Aeroplex*, 195 F.3d 1234 (11th Cir. 1999) to suggest that Infosys had an existing obligation to pay the Government when it filed LCAs for H-1B visa applications. (Dkt. #49 at 28–29). But *Pemco* supports Infosys's position, not Handloser's. The defendant in *Pemco*, unlike Infosys, "had a written contract which expressly obligated Pemco to be responsible and accountable for" certain property in its possession and that mandated the return of "that property to the government" or the disposal of "the property in accordance with the government's instructions." 195 F.3d at 1238. Handloser points to no express contract here between Infosys and the Government mandating the return of property or money. Indeed, there isn't one. To the extent *Pemco* is relevant here, it refutes rather than supports Handloser's position.

In sum, although Handloser alleges that Infosys took unlawful actions—underpaying employees and failing to obtain a proper visa for those employees—those actions are regulatory violations that may give rise to potential penalties, not "established dut[ies]." 31 U.S.C. § 3729(b)(3). Because Infosys had no obligation under the FCA to remit taxes for wages it did not pay, Handloser's underpayment-of-taxes theory fails to state a claim against Infosys.[6]

---

[6] Because the Court concludes that Handloser fails to state a claim under Rule 12(b)(6), it need not reach Infosys's other arguments that Handloser's claims are barred by (1) the tax bar, (2) the public-disclosure bar, and (3) the statute of limitations. *E.g.*, (Dkt. #42 at 14–17, 22–34, 36–37). That said, the Court notes that most of Handloser's supporting evidence, including all the practices Handloser witnessed as an Infosys employee, likely fall outside of the six-year statute of limitations, 31 U.S.C. § 3731(b)(1), which bars claims arising from acts before April 2, 2014. *See* (Dkt. #1) (complaint filed on April 2, 2020).

**C. Infosys's Alleged Underpayment of Visa-Application Fees**

Handloser next claims that Infosys wrongfully deprived the Government of visa-application fees by applying for cheaper L-1 visas for H-1B employees. This argument similarly fails because Infosys had no "obligation" to pay application fees for visa applications it never filed.[7]

The analysis here is much the same as the analysis for Handloser's tax-related claim above, *supra* Part III.B. The Court begins with Infosys's purported obligations. Handloser argues that Infosys's relationship with the Government, which is "governed by the USCIS' regulatory scheme," imposes an obligation "to seek the appropriate visa, and to pay the corresponding visa application fee when it was seeking visa authorization for work it knew required an H-1B visa[.]" (Dkt. #49 at 31). Although Handloser identifies no such statute or regulation imposing this obligation, the Court presumes Handloser is referring to USCIS Form G-1055, which requires "[e]ach application, petition, or request" to be "accompanied by the correct fee(s)." Of course, Handloser does not claim that Infosys failed to pay the proper fees for the applications it did submit. Nor does he claim that Infosys obtained H-1B visas by applying for L-1 visas. Instead, Handloser's claim rests on the idea that an obligation springs from the act of applying for visas itself, requiring Infosys to pay fees for the visa applications it *should have* submitted.

---

[7] The Court therefore need not opine on whether Handloser's second claim violates certain procedural prerequisites under the FCA. *E.g.*, (Dkt. #42 at 35–36). That said, the Court does note that the FAC made substantial edits to the original complaint, including adding this second FCA claim.

But as the Second Circuit has explained concerning the same type of reverse-FCA claim, "an obligation to pay higher visa application fees does not exist by the mere fact of a violation of immigration laws because that violation does not trigger an immediate and self-executing duty to pay the government those fees." *Billington*, 126 F.4th at 805 (citation modified). Thus, while Infosys may incur liability for violating applicable immigration statutes or regulations, the penalties it would consequently face—potential and contingent ones to be sure—would not include fees for visa applications it never submitted. *Id.*; *see also United States ex rel. Lesnik v. ISM Vuzem d.o.o.*, 112 F.4th 816, 820 (9th Cir. 2024) (concluding that defendants "had no 'established duty' to pay for visas for which they did not apply"); *Kini*, 2024 WL 474260, at *4 (finding that "defendant did not owe application fees" for visas "it did not apply for"). For this reason, Handloser's visa-application-fee claim similarly fails to state a claim for relief under the FCA.

Resisting this result, Handloser primarily relies on *Franchitti v. Cognizant Tech. Sols. Corp.*, 555 F.Supp.3d 63 (D.N.J. 2021). The *Franchitti* court found that an "'implied contractual' or 'fee-based' relationship" exists under the FCA between the Government and visa applicants like Infosys. *Id.* at 71. The *Franchitti* court supported this finding by concluding, without any analysis in support, that "[a] plain language reading of" the FCA "suggests that [the defendant] had an obligation to pay the appropriate fee for the privileges associated with its desired visa." *Id.* But as the Ninth Circuit has aptly noted, "The statute contains no such language." *Lesnik*, 112 F.4th at 820. In this regard, the *Franchitti* court's conclusion has proven to be an

14

outlier, unsupported by prior precedent and uniformly rejected by courts across the country, including our sister court in this District. *E.g.*, *Billington*, 126 F.4th at 805 & n.5 (holding that a defendant facing a similar reverse-FCA claim had no obligation under the FCA and finding *Franchitti*—the "sole opinion to conclude otherwise"—to be "unpersuasive"); *Palmer*, 2025 WL 1445864, at *11 (disagreeing with *Franchitti*'s interpretation of similar reverse-FCA claims); *Kini*, 2024 WL 474260, at *5 (rejecting *Franchitti*'s conclusion that there was an "implied contractual" relationship between the government and a similarly situated defendant). The Court finds the reasoning of the *Lesnik*, *Billington*, *Kini*, and *Palmer* courts to be persuasive and joins them in concluding that *Franchitti*'s conclusion was incorrect.

The Court also notes that *Franchitti*'s reasoning contradicts the Fifth Circuit's conclusions in *Bain*. The relator there similarly argued that a benefit received from the Government with certain obligations—an emissions permit with ongoing reporting requirements—"should be considered a contract with the government" under the FCA. 386 F.3d at 653. The Fifth Circuit rejected this argument, finding that only a regulatory relationship existed between the Government and the defendant, not "any sort of contractual or other economic relationship," meaning that any potential future civil penalties were not obligations under the FCA. *Id.* at 657–58. As with the defendant in *Bain*, Infosys has nothing more than a regulatory relationship with the Government—not a contractual one—and potential future obligations to pay penalties are not obligations under the FCA. *Id.*

15

Handloser also relies on *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006). But that reliance is misplaced: *Bahrani* is inapt. That case concerned an exporter who had allegedly altered export certificates issued by the United States Department of Agriculture ("USDA") "to avoid obtaining replacement certificates for which the company should have paid a fee[.]" *Id.* at 1192. Under the applicable regulatory scheme, the exporter had an obligation to pay this fee to the USDA for a replacement certificate upon determining that an error or omission in an export certificate was "major" or "significant." *Id.* The Tenth Circuit found that under this framework, the replacement-certificate fee constituted an automatic duty to pay that constituted an obligation under the FCA. *Id.*

By contrast, while Infosys could face *potential future* penalties by applying for the wrong type of visa, there is no automatic-fee provision that applies when an employer determines that it requires a foreign worker to come to the United States to perform H-1B work. Put another way, when a company determines that it needs an H-1B employee for a project, no statute mandates that it apply for an H-1B visa. And, to the extent Handloser reads *Bahrani* to suggest that a defendant has an obligation to pay for a government entitlement it never applied for, the Court rejects this reading as inconsistent with *Simoneaux* and *Bain*.[8]

---

[8] The other courts to evaluate *Bahrani* in this context concluded the same. *E.g.*, *Billington*, 126 F.4th at 806 ("In any case, to the extent that *Conagra* held that application fees are obliged for certificates the defendant did not apply for, it is flatly inconsistent with our circuit's reasoning in *Miller v. United States ex rel. Miller*, 110 F.4th 533 (2d Cir. 2024)." (citation modified) (citing *Kini*, 2024 WL 474260, at *5)).

16

Because there was no "established duty" for Infosys to pay a fee for visa applications that were never submitted, Handloser's visa-application-fee theory fails to state a claim under the FCA.

**D. Dismissal With Prejudice**

Having determined that both of Handloser's legal theories fail to state a claim under the FCA, the Court must decide whether to dismiss Handloser's claims with or without prejudice. "A dismissal with prejudice is appropriate when amending a complaint would be futile." *Taubenfeld v. Hotels.com*, 385 F.Supp.2d 587, 592 (N.D. Tex. 2004). The Fifth Circuit has defined "futile" to mean "that the amended complaint would fail to state a claim upon which relief could be granted," applying the same standard as Rule 12(b)(6). *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 873 (5th Cir. 2000).

Here, despite filing an amended complaint that sought to remedy the defects in his pleading identified by both Infosys and the Government when declining to intervene, Handloser could not remedy his prior pleading deficiencies. This is unsurprising, given that Handloser's claims turn on untenable legal theories. Further amendment cannot fix legally groundless claims. Under the circumstances, the Court concludes that allowing Handloser to file a second amended complaint would be futile, and therefore the Court will dismiss his first amended complaint with prejudice.

## IV. CONCLUSION

The First Amended Complaint, (Dkt. #33), fails to state a claim under the FCA.

It is therefore **ORDERED** that Infosys Limited's Motion to Dismiss Qui Tam Complaint, (Dkt. #42), is **GRANTED**.

It is further **ORDERED** that Relator Handloser's claims for violations of the False Claims Act, 31 U.S.C. § 3729, are **DISMISSED with prejudice**.

**So ORDERED and SIGNED this 21st day of July, 2025.**

_____
SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE